UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

STACY ANTONIO SCOTT, JR.,

               Plaintiff,

v.                                       Case No: 6:19-cv-1753-JSS-DCI

GLENN WHITE, ROBERT
STOCKMAN, EUNICE MARMOL,
MATTHEW PIPPIN, and ROBERT
ALDERMAN,

               Defendants.
_____/

## ORDER

    In this 42 U.S.C. § 1983 case alleging excessive force and battery following Plaintiff's arrest, Defendants, Glenn White, Robert Stockman, Eunice Marmol, Matthew Pippin, and Robert Alderman, move for summary judgment. (Dkt. 106; *see* Dkts. 132, 133.)  Plaintiff, Stacy Antonio Scott, Jr., a prisoner proceeding pro se, opposes the motion. (Dkt. 131.)  Upon consideration, for the reasons outlined below, the court denies the motion.

## FACTS[1]

    Plaintiff is a transgender prisoner serving her sentence in the custody of the Florida Department of Corrections (FDOC). (Dkt. 31 at 2, 10, 12; Dkt. 107 at 6, 64.)

---

[1] In deriving the facts from the record, the court "draw[s] all inferences and view[s] all evidence in the light most favorable to" Plaintiff as the nonmoving party.  *See Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015).

Defendants are Osceola County Sheriff's Deputies. (Dkt. 31 at 2–3; Dkt. 71 at 1; Dkt. 80 at 1.) On the evening of July 12, 2013, Plaintiff and three criminal codefendants went to a department store in Kissimmee, Florida, with a plan to shoplift. (Dkt. 31 at 12; Dkt. 107 at 120–21; Dkt. 118 at 2.) They arrived in a Pontiac vehicle, which they parked "in the front in the first parking space." (Dkt. 107 at 122–23.) All four entered the store, where they were subsequently observed shoplifting. (*Id.* at 122; Dkt. 130-5 at 5.)

Deputies White and Stockman were performing off-duty work for the Osceola County shopping plaza where the department store was located. (Dkt. 119 at 2; *accord* Dkt. 120 at 3, 5.) The off-duty work entailed "enforcing traffic laws, taking reports, making arrests," and doing similar law enforcement activities "specifically for" the shopping plaza. (*Id.*) Deputy White wore his green police uniform and drove an unmarked, white Chevy Impala. (Dkt. 119 at 3.) Deputy Stockman wore his police uniform and drove a patrol car marked for the Osceola County Sheriff's Office. (Dkt. 120 at 3–4.) Security officials notified Deputies White and Stockman about the four suspected shoplifters. (Dkt. 119 at 4–5; Dkt. 120 at 5–6.) Deputy White could see the store entrance from his location. (Dkt. 119 at 6–7.) He observed people matching the description of the shoplifting suspects fleeing the department store, and he pulled his patrol car up to the suspects' vehicle with his lights and sirens on. (*Id.* at 7–9; Dkt. 107 at 123–24.)

Deputy Stockman advanced closer to the store, but his view of the front was obstructed as he waited for the shoplifters to exit the store, which they did at

approximately 10:22 P.M.  (Dkt. 120 at 10–12.)  The suspects ran from the store and

got in the car with Plaintiff as the driver.  (Dkt. 107 at 124; Dkt. 119 at 9–10; Dkt. 120

at 10; Dkt. 130-5 at 6.)  When Deputy Stockman heard that the suspects had fled the

store, he followed a marked security car and activated his lights and sirens, and when

he spotted the suspects running from the store, he positioned his patrol car closer to

the suspects' vehicle.  (Dkt. 120 at 10–12; *see also* Dkt. 107 at 123–24.)  Plaintiff and

her codefendants then fled the scene with Deputies White and Stockman in pursuit.

(Dkt. 31 at 12; Dkt. 71 at 2; Dkt. 80 at 2; Dkt. 118 at 2, 4; Dkt. 119 at 13–23; Dkt. 120

at 13, 19–24.)

Deputies White and Stockman testified at Plaintiff's criminal trial that Plaintiff

struck their patrol cars as she drove off.  (Dkt. 31 at 12; Dkt. 71 at 2; Dkt. 80 at 2; Dkt.

118 at 4; Dkt. 119 at 9–11; Dkt. 120 at 10–13.)  However, Plaintiff testified that to her

knowledge, she did not hit the police cars with her vehicle and she "felt no impact

when [she] pulled out."  (Dkt. 118 at 3–4, 19.)  Plaintiff's codefendant Sh'Tara Barnes

corroborated Plaintiff's version of events, testifying at Plaintiff's criminal trial that

Plaintiff did not hit the patrol cars.  (Dkt. 130-5 at 7.)  When deposed in this case,

Plaintiff confirmed that she did not strike the patrol cars.  (Dkt. 107 at 189.)  Instead,

according to Plaintiff, Deputy Stockman's patrol car struck the back of the vehicle

Plaintiff was driving.  (*Id.*)  A related discrepancy is reflected in Deputy White's

incident report.  According to the report, Deputy White "pulled [his] unmarked patrol

vehicle remarkably close to the driver's side front bumper while [Deputy] Stockman

also pulled his marked patrol vehicle eerily close to the center of the front bumper of

the Pontiac." (Dkt. 107-8 at 17; *accord id.* at 37.)  However, Plaintiff stated that she

had five feet of room between the vehicle she was driving and each of the patrol cars

and that had she believed she lacked the space to exit without injury to the officers or

damage to their cars, she would not have done so.  (Dkt. 118 at 18–19.)

Deputy Stockman testified during the criminal trial that his vehicle suffered

extensive damage from the incident involving Plaintiff.  (Dkt. 120 at 19.)  He stated

that a bumper had been torn off, a headlight had been broken, and the engine, radiator,

and body of the car had been damaged.  (*Id.*)  He described the vehicle as "effectively

disabled" but still drivable.  (*Id.* at 19, 36.)  According to Deputy Stockman, as he

pursued the fleeing vehicle, he had to restart his car several times and had trouble

keeping up with the chase because of the extensive damage.  (*Id.* at 19–25.)

Eventually, the fleeing vehicle and Deputy White's patrol car collided, and both

vehicles slid off the road onto an embankment in front of a restaurant near the

shopping plaza.  (Dkt. 107 at 124; Dkt. 118 at 4–7; Dkt. 119 at 23–25; Dkt. 120 at 24–

25; Dkt. 130-5 at 10, 24–25.)  When the vehicles came to rest, Plaintiff and Ms. Barnes

fled on foot and hid in the dumpsters behind another restaurant.  (Dkt. 107 at 124;

Dkt. 118 at 7; Dkt. 119 at 25; Dkt. 130-5 at 11–12.)  Deputy White did not pursue

them when they fled, as he was occupied taking the two remaining passengers from

the fleeing Pontiac into custody.  (Dkt. 119 at 26.)  Deputy White also searched and

photographed the vehicle driven by Plaintiff, and he photographed his patrol car.  (*Id.*

at 27–30.)  Deputy Stockman, who arrived on the scene shortly after the collision,

assisted Deputy White in taking the two remaining passengers into custody and

- 4 -

engaged in various administrative duties at the scene, including reporting the collision to the Florida Highway Patrol. (Dkt. 120 at 25–27.)

Law enforcement began an intensive search for Plaintiff and Ms. Barnes, which involved "numerous . . . law enforcement officers from different agencies," as well as "all sorts of police assets" including "helicopters, dogs, . . . [and] undercover vehicles." (*Id.* at 26–27; *accord id.* at 41–42; *see also* Dkts. 108-1, 109-1, 110-1, 111-1, 112-1.) Plaintiff and Ms. Barnes remained hidden in the dumpsters for one to two hours. (Dkt. 107 at 125, 131; Dkt. 118 at 7; Dkt. 130-5 at 12.) Meanwhile, Deputy Pippin was asked to assist with the canine search because he had five years of previous experience as a canine officer. (Dkt. 121 at 2.) Multiple law enforcement dogs were involved in the search, and when the dogs lost the scent, Deputy Pippin started an area search. (*Id.* at 4–5.) He followed the path of the dogs, searched around bushes, and eventually found Plaintiff and Ms. Barnes hiding in the dumpsters. (*Id.* at 5–8.)

From this point, Plaintiff's and Defendants' versions of the facts differ significantly. The court recounts Defendants' version first, though it credits Plaintiff's version over theirs where the versions conflict. Deputies White and Stockman testified at Plaintiff's trial that they remained at the scene of the collision and did not go to the scene where Plaintiff was apprehended. (*See* Dkt. 119 at 27; Dkt. 120 at 27; *see also* Dkt. 108 at 2; Dkt. 109 at 2.) Deputy Pippin testified that after discovering Plaintiff and Ms. Barnes in the dumpsters, he instructed them to "show [him] their hands," which were not visible there. (Dkt. 121 at 8–9.) Ms. Barnes complied with this instruction and exited the dumpsters. (*Id.* at 9.) In contrast, Plaintiff largely

disregarded the officers and did not show her hands. (*Id.*) Deputy Pippin and another officer, who was not Deputy White, "had to reach down . . . and pull [Plaintiff] out." (*Id.* at 9–12.) At that point, Plaintiff was handcuffed. (*Id.*; Dkt. 112 at 3.) Deputy White next encountered Plaintiff when he identified her as the driver of the fleeing vehicle after she was taken into custody. (Dkt. 119 at 34–35.) Neither Deputy White nor Deputy Stockman interacted with Plaintiff until after the deputies returned to the Osceola County Sheriff's Office. (*Id.* at 35; Dkt. 120 at 28.)

Deputies White, Stockman, Marmol, and Alderman declared that they were not present when Plaintiff was handcuffed and that they did not beat or otherwise use force against Plaintiff while she was handcuffed. (*See* Dkt. 108 at 2; Dkt. 109 at 2; Dkt. 110 at 2; Dkt. 111 at 2; *see also* Dkt. 113 at 4; Dkt. 114 at 4; Dkt. 115 at 4; Dkt. 116 at 4.) Further, they claimed, they were unaware of officers "mak[ing] any statement or gestures to . . . Plaintiff indicating [their] intent to harm her during the course of [her] arrest," (Dkt. 113 at 6; Dkt. 114 at 6; Dkt. 115 at 6; Dkt. 116 at 6; Dkt. 117 at 6), did not know if any officer drew a service weapon on Plaintiff, (Dkt. 113 at 3; Dkt. 114 at 3; Dkt. 115 at 3; Dkt. 116 at 3; Dkt. 117 at 3), and did not physically place handcuffs on Plaintiff, (Dkt. 113 at 4, 7; Dkt. 114 at 4, 7; Dkt. 114 at 4, 7; Dkt. 116 at 4, 7). In addition, according to Deputy Pippin, although he apprehended Plaintiff, he did not punch Plaintiff in the mouth or see the other officer do so, he did not use unnecessary force while Plaintiff was being handcuffed, and he did not beat Plaintiff while she was handcuffed. (Dkt. 112 at 2–3; Dkt. 121 at 12.) Deputy Pippin also stated that he "do[es] not recall whether [he] placed handcuffs on . . . Plaintiff or

if another officer did so." (Dkt. 117 at 7.)

Deputies White and Stockman testified at Plaintiff's criminal trial that when they arrived at the Osceola County Sheriff's Office after the incident, they wrote up their reports. (Dkt. 119 at 35; Dkt. 120 at 28.) Both deputies encountered Plaintiff at the station during or after finalizing their reports, and they acted professionally and did not make fun of her regarding her sexual orientation. (Dkt. 119 at 35–36; Dkt. 120 at 28–29, 51–52.) They observed that Plaintiff was "grandstanding." (Dkt. 119 at 35–36; Dkt. 120 at 28–29, 47.) Deputy White described Plaintiff as "borderline belligerent" and stated that she was "[b]oasting about how [she] was there." (Dkt. 119 at 36, 49.) Deputy Stockman testified that Plaintiff was being cocky and loud, (Dkt. 120 at 47), and that Plaintiff stated

> that this was no big deal, . . . that this was a very minor incident. [She] was bragging about other things . . . [she] had done, comparing the method of taking subjects into custody . . . by the Osceola County Sheriff's Office with other agencies. And, literally, [she] never stopped talking within the . . . patrol area,

(*id.* at 28–29). At one point, in response to Plaintiff's "numerous statements minimizing" the circumstances, Deputy Stockman stated: "[Y]ou hit my car." (*Id.* at 29.) Plaintiff responded: "[D]amn right." (*Id.*) Further, Deputy White testified that he did not touch Plaintiff and did not witness Deputy Stockman touch Plaintiff. (Dkt. 119 at 36–37.)

Plaintiff describes the facts differently. According to her deposition testimony, Deputies Pippin and Alderman were present when the dumpster lids opened. (Dkt.

107 at 126–27, 139.)  She raised her hands, and because she feared that the officers would mistake her cell phone for a weapon, she informed them that it was on and was in her hands.  (*Id.* at 136.)  The officers drew their firearms on Plaintiff and Ms. Barnes, and Deputy Pippin indicated over the radio that the suspects had been located.  (*Id.* at 137–39, 141–42, 200–01.)  Deputies White, Stockman, and Marmol arrived within thirty-five to forty seconds and drew their firearms on Plaintiff.  (*Id.*)

Plaintiff testified that Deputy Pippin used a highly offensive homophobic slur when ordering her to exit the dumpsters.  (*Id.* at 137, 202.)  Plaintiff did not want to lower her hands because she was afraid that the officers would think she was trying to run again, so she asked for assistance.  (*Id.*)  Deputy White then approached, placed his firearm to Plaintiff's head, and told her that if she did not exit the dumpsters, he would "blow [her] head off."  (*Id.* at 137–38.)

Thereafter, according to Plaintiff, the deputies punched and kicked her as Deputy Pippin and another deputy dragged her from the dumpsters, and the deputies "put flashlights in [her] face" in order "to cover up who was hitting [her]."  (*Id.* at 138–42; Dkt. 118 at 8; *see* Dkt. 130-5 at 12 (Ms. Barnes's testimony corroborating that the deputies beat Plaintiff as they pulled her out of the dumpsters).)  Plaintiff stated that she was dragged from the dumpsters by her hair and her shirt.  (Dkt. 107 at 138.)  She also stated that the deputies grabbed her arms first and then "the side of [her] shoulder . . . to gain control of [her] legs."  (*Id.* at 143.)  Next, the deputies slammed Plaintiff to the ground, where she landed on her right knee, which made a popping sound and swelled up.  (*Id.* at 138, 143.)  Deputy White placed his knee on her back

and handcuffed her. (*Id.* at 143–44.)

After Plaintiff was handcuffed, Deputies Pippin, White, Marmol, Stockman, and Alderman repeatedly kicked, punched, and dragged Plaintiff for five to seven minutes. (*Id.* at 138–40, 144–48, 208–10.) In Plaintiff's view, the deputies were angry with her because Deputy White had told the others that she had tried to kill him and because she "had the audacity to run." (*Id.* at 148–49, 190, 214.) Accordingly, the officers "beat[] her repeatedly by punching and kicking her . . . head, slamming her head into the pavement, kicking her in the sides causing one of her ribs to make a loud popping noise, and hitting her in the testicles" while misgendering her and calling her a highly offensive homophobic slur. (*Id.* at 209–10.)

To reiterate, according to Plaintiff, as the officers beat her, they also "chastised [her], hurled homophobic slurs" at her, and "cursed her for running from them and making them have to search for her." (*Id.* at 211.) After a sergeant called her a "fucking disgrace to men" and a "fucking sissy," (*id.* at 211–12), Plaintiff was "struck in the back of the head with a heavy blunt object causing her to lose consciousness," (*id.* at 212–13). When she regained consciousness, she observed Deputy White quickly walking away from the area with a black object resembling a flashlight. (*Id.* at 213.)

Plaintiff was dragged to a police car and placed in the back seat. (*Id.*) At some point, the sergeant opened the door to the car and confronted her. (*Id.* at 213–14.) He told her that officers "hold grudges against" suspects who flee, he threatened to kill her, and he called her a highly offensive homophobic slur. (*Id.*) Moreover, he

- 9 -

"punch[ed] her in the side of the face with a closed fist" and slammed the door. (*Id.* at 214.) A paramedic attended to Plaintiff at the scene, but the deputies did not permit her to speak with the paramedic, who merely swabbed her face with "a gauze with some kind of solution that smell[ed] like . . . [w]itch [h]azel." (*Id.* at 149.)

The parties agree that Deputy Marmol eventually transported Plaintiff to the Osceola County Sheriff's Office. (*Id.* at 150; Dkt. 110 at 2; Dkt. 118 at 8–9; Dkt. 119 at 35; Dkt. 130-5 at 13.) However, Plaintiff claims that once there, Deputy Marmol removed Plaintiff from the patrol car, placed a firearm against Plaintiff's head, and threatened to "blow [Plaintiff's] fucking brains out" if Plaintiff attempted to move. (Dkt. 31 at 13.) Plaintiff testified during her trial that inside the station, Deputy Stockman told her that he "should have shot" her for what she had done. (Dkt. 118 at 10.) Although Plaintiff did not respond, the deputy "continued to badger" her. (*Id.*) He "said things to try to make [her] mad[,] . . . talked about [her] sexual preference[, and] . . . told [her] that he was gonna make sure [she] spent the rest of [her] life[—]or as many years as he c[ould] get out of [her—]in prison[,] . . . [and that she] was gonna go down" for her misconduct. (*Id.* at 10–11.) Plaintiff testified that she simply "shrugged off everything he was saying." (*Id.* at 11.) Ms. Barnes similarly testified that although "all the officers w[ere] nitpicking at [Plaintiff] about h[er] old jail pictures" and made fun of Plaintiff because of how she looked and acted and because she was gay, Plaintiff remained "completely silent." (Dkt. 130-5 at 13, 18.) Plaintiff further stated that whenever a detective superior to the officers in rank would come out to the main area to take Plaintiff or a codefendant to the interview room,

"everything would die down[, b]ut as soon as" the detective left, the comments "would start back up." (Dkt. 118 at 11.)

Plaintiff testified at her trial that she suffered injuries from the beating, including that her "whole side had been scraped from when they dragged [her] on the ground," her "hand was cut," she "had a gash on the side of her face," (*id.* at 8), and she had a cut on her finger, (*id.* at 23). In addition, Plaintiff testified in her deposition for this case that her right knee was injured and swollen. (Dkt. 107 at 138, 143.) Plaintiff has submitted photographs that purport to show scars remaining from her injuries. (Dkt. 130-1 at 2–3; Dkt. 130-2 at 2; Dkt. 130-3 at 2–3; Dkt. 130-4 at 2.)

Medical forms used by the Osceola County Corrections Department to process Plaintiff's intake indicate that she had a scrape on her right knee but no other injuries, (Dkt. 107-9 at 4–11), and that she was not "injured in an accident" on the day of her processing and did not "have any injuries," (*id.* at 2). According to Plaintiff, however, "[s]omebody in the booking department" filled out the forms, and afterwards, "all [she] was told was to sign." (Dkt. 107 at 153.) The officers did not go over the forms with her or tell her what they were. (*Id.*) All she knew was that they were booking forms. (*Id.*) According to Plaintiff, "[n]obody asked [her] any questions." (*Id.*) Moreover, Plaintiff alleges that at the Osceola County Jail, "the intake nurse refused to notate or examine [Plaintiff's] injuries, claiming there was nothing wrong with Plaintiff." (Dkt. 31 at 14.) The nurse called the injuries to Plaintiff's knee and ribs "minor, a waste of time, unworthy of notation[ or] examination, and incidental to her arrest." (*Id.*)

Plaintiff further alleges that she could not walk without a limp and had difficulty sleeping. (*Id.*) She "experienced and continues to experience vision diminishment and trouble urinating due to being kicked in the face and testicles." (*Id.*) Plaintiff also claims to have scars on the right side of her head and under her right eye, daily severe migraines, and continuing knee pain. (*Id.* at 11.) Reportedly, by the time of her deposition, her knees had deteriorated, and it had become difficult for her to bear weight on her legs. (Dkt. 107 at 8.)

## PROCEDURAL HISTORY

Plaintiff sues Defendants in their individual capacities in connection with her July 2013 arrest. (*See* Dkt. 31 at 2–3, 8, 11–12.) Plaintiff initially sued Deputies White, Stockman, Marmol, and Pippin for excessive force under section 1983 and battery under state law. (Dkt. 1.) After Plaintiff filed an amended complaint, which added Deputy Alderman as a party to the case, (*see* Dkt. 31 at 8), Deputies White, Stockman, Marmol, and Pippin moved to dismiss arguing that the claims against them were barred by the applicable statute of limitations, that Plaintiff failed to state a claim, and that they were entitled to qualified immunity on the federal claims and statutory immunity on the state law claims, (*see* Dkt. 34). Finding that the action was barred by the applicable statute of limitations, the court granted the motion to dismiss. (Dkt. 46.) Plaintiff appealed, and the Eleventh Circuit vacated the judgment and remanded the case. *See Scott v. White*, No. 21-11317, 2022 WL 3449560, 2022 U.S. App. LEXIS 22854 (11th Cir. Aug. 17, 2022).

On remand, Deputies White, Stockman, Marmol, and Pippin renewed their

motion to dismiss. (Dkt. 64.) The court granted the motion as to the excessive force and battery claims against them for their alleged conduct before Plaintiff was handcuffed. (Dkt. 67 at 25–26.) The court also granted the motion "to the extent the [a]mended [c]omplaint may be read to allege a claim of constitutional violation related to Deputy Marmol's placing of her service weapon to Plaintiff's head and threatening her and related to Deputies Stockman, Marmol, and White taunting and threatening Plaintiff at the police station." (*Id.* at 26.) The court allowed the case to proceed on the excessive force and battery claims against Deputy Alderman and against Deputies White, Stockman, Marmol, and Pippin for their alleged conduct after Plaintiff was handcuffed. (*Id.* at 25–26.) Discovery closed in August 2024, (*see* Dkt. 97 at 2), and Defendants filed their motion for summary judgment in October 2024, (*see* Dkt. 106).

## APPLICABLE STANDARDS

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record."

(quotation omitted)).  A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.*

The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the moving party shows the absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes precluding judgment as a matter of law.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).  To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))).

In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the

non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

Although the court "give[s] liberal construction" to pro se filings, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007), pro se plaintiffs are still "required . . . to conform to procedural rules," *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002). *See Cummings v. Dep't of Corr.*, 757 F.3d 1228, 1234 n.10 (11th Cir. 2014) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law." (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981))).

## ANALYSIS

The court first discusses Defendants' statute of limitations defense. The court then considers Plaintiff's excessive force and battery claims in turn.

### A. Statute of Limitations

Although section 1983 does not set out a limitations period, section 1983 claims are "governed by the forum state's residual personal injury statute of limitations, which in Florida" sets a limitations period of four years. *City of Hialeah v. Rojas*, 311 F.3d 1096, 1103 n.2 (11th Cir. 2002); *see* Fla. Stat. § 95.11(3)(o). Florida civil battery claims

are subject to the same limitations period. *See* Fla. Stat. § 95.11(3)(n). Given that the complained-of events took place in July 2013, this action is timely if it was filed by July 2017.

In general, a civil litigant who chooses to send a legal document by mail for submission to the court "assumes the risk of untimely delivery and filing," but a pro se prisoner "has no choice but to hand [a document] over to prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 275 (1988). "[P]ro se prisoners are unable to file personally in the clerk's office, they cannot utilize a private express carrier, and they cannot place a telephone call to ascertain whether a document mailed for filing arrived." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014) (quotation omitted). Nor do they "have counsel to monitor the filing process." *Id.* (quotation omitted). Therefore, "[u]nder the prison mailbox rule, a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Id.* (quotation omitted). "Absent evidence to the contrary, [the court] assume[s] that a prisoner delivered a filing to prison authorities on the date that he signed it." *Id.* Defendants bear the burden to prove the contrary. *Id.* Moreover,

> [a] district court cannot negate the prison mailbox rule by finding a prisoner did not show diligence in following up on his filing *if* the prisoner actually gave the filing to prison authorities when it was dated. However, in deciding whether a filing was in fact ever delivered to prison authorities, a court can consider whether the prisoner exercised the diligence expected of a reasonable person in his circumstances in following up on a purported filing.

*Id.* at 1315 (citation and quotation omitted).

On September 9, 2019, the court docketed Plaintiff's initial complaint, which shows a signature date of December 21, 2016. (Dkt. 1 at 19.) Further, the initial complaint bears a stamp stating that it was "provided to Apalachee [Correctional Institution (CI)] on 12/21/16 for mailing." (*Id.* at 1.) However, the envelope containing the initial complaint gives the return address for Plaintiff as Santa Rosa CI, not Apalachee CI. (*See* Dkt. 46 at 7 n.2; Dkt. 107 at 106.) On March 16, 2020, the court docketed the amended complaint, which shows a signature date of June 28, 2017. (Dkt. 31 at 26.) The amended complaint bears a stamp indicating that it was provided to Apalachee CI prison officials for mailing on June 28, 2017. (*Id.* at 1.)

At her deposition, Plaintiff testified that the FDOC's legal mail procedure is the same at each FDOC correctional institution:

> When you have a legal document, they make an announcement for legal mail. A mailroom official will look at your document, just basically the front page to make sure [it is] going to either a court, a government agency[,] or an attorney. Once they verify that it is, in fact, a legal document, they stamp the front of it. When they stamp the front of it, you will initial wherever they direct you to on the top, on the side, wherever. They put it in the envelope. The envelope is stamped. You initial the envelope, and [it is] mailed out.

(Dkt. 107 at 81.) The inmate also provides a second copy of the legal document to the mailroom official, which undergoes the same stamp and signature process, and the inmate keeps that second copy for their own records. (*Id.* at 82, 90–91, 100–02.) Thus, the mailroom official stamps and initials both copies, but only one is mailed, and the inmate keeps the other as proof of mailing. (*Id.*)

Plaintiff testified that she provided the initial complaint to Apalachee CI prison officials for mailing on December 21, 2016, (*id.* at 90, 92), which "apparently did[ not] make it to the [c]ourt," (*id.* at 93; *see also id.* at 94–95). She "d[oes not] know what happened to it" and "had no way of tracking it." (*Id.* at 98.) Similarly, she provided the amended complaint to Apalachee CI mailroom officials on June 28, 2017, and that pleading also failed to make it to the court. (*Id.* at 105.) Plaintiff stated that she sent "several notices of inquiries" to the court but received no response. (*Id.* at 98–99; *see also id.* at 111–15 (identifying nine notices of inquiry Plaintiff purportedly mailed from Apalachee CI in 2017 that were not received by the court).) Before Plaintiff was transferred from Apalachee CI, she also had her sister call the court, but the court personnel "did[ not] know what she was talking about." (*Id.* at 103.)

In 2019, Plaintiff "went into [her] legal vault, . . . made a copy, and . . . mailed [the initial complaint] again" from her then-current location at Santa Rosa CI. (*Id.* at 102; *see id.* at 93–97.) According to Plaintiff, the remailed initial complaint does not bear a stamp from Santa Rosa CI "because it already had a date stamp on it" and "the legal mail lady at Santa Rosa . . . would[ not] stamp it twice." (*Id.* at 96.) In March 2020, Plaintiff remailed a copy of the amended complaint from Blackwater River CI. (*Id.* at 104–08.) During her deposition, she explained that she remailed the initial complaint first based on the statute of limitations and the mailbox rule because she wanted to show that the initial complaint was sent out on December 21, 2016. (*Id.* at 107–08.) She ended up waiting six months after remailing the initial complaint to

remail the amended complaint because "when [she is] not using [her] legal stuff, [she] put[s] it in legal storage. And in that time[]frame, [she] was in the process of getting transferred . . . , and [she] was [also] in confinement." (*Id.* at 108.) Plaintiff has filed at least three lawsuits in state court under similar circumstances—that is, she purportedly mailed original pleadings that were never received and then remailed copies of the pleadings at a later date. (*See id.* at 114–18.)

In light of the above, a reasonable factfinder could conclude that Plaintiff's initial complaint was filed on December 21, 2016. Because this date falls well within the limitations period, Defendants are not entitled to summary judgment on their statute of limitations defense. Their arguments to the contrary are not persuasive.

Defendants first argue that the initial and amended complaints on the docket are merely copies mailed well after the expiration of the statute of limitations and that the original pleadings were never received by the court. (Dkt. 106 at 15–17.) However, the fact that the court did not receive the originals is not dispositive, as "[t]he mailbox rule may be applied even when a prisoner's pleading is 'lost' and never received by the district court." *Bullock v. United States*, 655 F. App'x 739, 741 (11th Cir. 2016) (citing *Allen v. Culliver*, 471 F.3d 1196, 1198 (11th Cir. 2006)).

Defendants further maintain that the record reflects a consistent lack of diligence by Plaintiff with regard to this action. (Dkt. 106 at 17–19.) In Defendants' view, Plaintiff "made no effort to allegedly bring this lawsuit until December 21, 2016, almost three and a half years into the four-year statute of limitations period," even though her "criminal trial took place in March 2014, and [she] therefore . . . had access

to all relevant case materials and had personally witnessed the various deputies testifying in the criminal trial." (*Id.* at 17.) She then "waited two years and nine months from the alleged filing date of December 21, 2016"—which was "two years and two months from the expiration of the statute of limitations"—"to 're[]submit' the [initial c]omplaint," despite having purportedly sent multiple inquiries to the court that went unanswered. (*Id.* at 18.) Moreover, when she allegedly resubmitted the initial complaint in September 2019, she did not include the amended complaint with it and instead waited another six months to send the amended complaint. (*Id.*) To call Plaintiff's credibility into question, Defendants state that she has a "pattern and practice of filing lawsuits many years after the statute of limitations has expired, . . . yet those lawsuits somehow contain a prison stamp with a handwritten date that falls within the statute of limitations period." (*Id.* at 17.) They also point to her "documented history of fraudulent criminal activities, including the fraudulent use of others' personal information for her own financial gain." (*Id.* at 19.)

On summary judgment, the court cannot evaluate Plaintiff's credibility as a witness. *See Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1266 n.1 (11th Cir. 2006) ("Credibility determinations at the summary judgment stage are impermissible."). Additionally, evidence supports that Plaintiff delivered the initial complaint to Apalachee CI officials for mailing on December 21, 2016, and the court does not consider that delivery a last-minute attempt at filing. Ultimately, Defendants have failed to meet their burden to show that Plaintiff did not deliver the initial complaint on that date. The court thus applies the mailbox rule to Plaintiff's filing of the initial

complaint in this action such that her initial complaint is deemed filed on December 21, 2016—within the applicable limitations period.  *See Jeffries*, 748 F.3d at 1314–15. Accordingly, Defendants are not entitled to summary judgment on the basis of the statute of limitations.

## B. Excessive Force

Defendants assert their entitlement to qualified immunity for Plaintiff's claims of excessive force under section 1983.  (Dkt. 106 at 20–24.)  In Defendants' view, Plaintiff fails to put forth sufficient evidence that they used force on her while she was handcuffed, and Plaintiff's alleged injuries were de minimis.  (*Id.* at 22–24.) "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).  To assert qualified immunity, "a government official must have been acting within the scope of his 'discretionary authority' when the allegedly wrongful acts occurred."  *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021).  "After a government official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff . . . ."  *Id.*  To avoid the application of qualified immunity, a plaintiff "must establish that a reasonable jury could find that [the officers] violated [the plaintiff's] constitutional right, and that [t]his right was 'clearly established' when [the officers] violated it."  *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th

Cir. 2019)).  The court views the facts in the light most favorable to the plaintiff.  *See
id.*  "If, at the summary judgment stage, the evidence construed in the light most
favorable to the plaintiff shows that there are facts inconsistent with granting qualified
immunity, then the case and the qualified immunity defense proceed to trial."  *Stryker
v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020).

The parties do not dispute that the officers were acting within the scope of their
discretionary authority when the alleged misconduct occurred, (Dkt. 71 at 6; Dkt. 80
at 6; *see* Dkt. 131 at 13–17), and indeed, "[i]nvestigating crimes, conducting searches,
and making arrests are legitimate job-related functions within the discretionary
authority of police officers," *Mears v. Brett McCulley*, 881 F. Supp. 2d 1305, 1318–19
(N.D. Ala. 2012).  Therefore, Plaintiff must establish that Defendants violated her
constitutional right to be free from the use of excessive force and that such right was
clearly established under the law.  *See Nelson*, 89 F.4th at 1296; *Spencer*, 5 F.4th at 1230.

The Fourth Amendment protects against the use of excessive force during an
arrest.  *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).  As the Supreme
Court has explained, "Fourth Amendment jurisprudence has long recognized that the
right to make an arrest or investigatory stop necessarily carries with it the right to use
some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490
U.S. 386, 396 (1989).  Therefore, a claim of "excessive force in the course of making
an arrest, investigatory stop, or other [bodily] 'seizure'" is "properly analyzed under
the Fourth Amendment's 'objective reasonableness' standard."  *Id.* at 388.  The
reasonableness of a particular use of force must be judged "from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 396). The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's justification for using force and must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (quotation omitted). "Other considerations are the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted." *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014) (alteration adopted and quotation omitted). "As the Supreme Court recently confirmed, this analysis precludes 'put[ting] on chronological blinders.'" *Heid v. Rutkoski*, 143 F.4th 1255, 1262 (11th Cir. 2025) (quoting *Barnes v. Felix*, 145 S. Ct. 1353, 1359 (2025)). "The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force." *Id.* (quoting *Barnes*, 145 S. Ct. at 1358). Finally, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

Plaintiff testified that when she was handcuffed and not resisting, Defendants repeatedly kicked, punched, and dragged her for at least five minutes. (Dkt. 107 at 138–40, 144–49, 190, 208–10, 212–14.) According to Plaintiff, Defendants were angry because she fled and because they believed she had tried to kill a deputy with a car, so

they punched and kicked her in the head, face, sides, and testicles, hurled homophobic slurs at her, and cursed her for running from law enforcement. (*Id.*)  At one point, Plaintiff stated, someone struck her in the back of the head, and she briefly lost consciousness. (*Id.*)  In addition, record evidence supports that Plaintiff incurred injuries from Defendants' conduct from which she still suffers today, (*id.* at 138, 143; Dkt. 118 at 8, 23; Dkt. 130-1 at 2–3; Dkt. 130-2 at 2; Dkt. 130-3 at 2–3; Dkt. 130-4 at 2), and that the injuries were not properly recorded on the intake forms, (*see* Dkt. 107 at 153).  In the light most favorable to Plaintiff, the injuries are not de minimis. *See Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) (determining that injuries sustained during a "collective beating" were not de minimis).  Defendants point to contrary evidence about what happened, but the disputes of material fact preclude summary judgment.  A reasonable factfinder viewing the evidence in the light most favorable to Plaintiff could conclude that Defendants subjected her to excessive force after she was handcuffed.  Although Plaintiff was suspected of committing objectively serious offenses, the record supports that the search had ended, she had been found, subdued, and handcuffed, and no further use of force was necessary. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) ("[G]ratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force.").

Moreover, Plaintiff's right to be free from the use of excessive force was clearly established when Defendants engaged in the alleged misconduct.  "To determine whether a right was clearly established, [this court] look[s] to binding decisions of the Supreme Court of the United States, [the Eleventh Circuit], and the highest court of

the relevant state (here, Florida)." *Glasscox v. Argo*, 903 F.3d 1207, 1217 (11th Cir.
2018). Here, *Hadley*, 526 F.3d 1324, among other cases, should have put Defendants
on notice that beating up Plaintiff when she was handcuffed and not resisting violated
clearly established law. *See also Saunders*, 766 F.3d at 1265 ("[The Eleventh Circuit
has] repeatedly ruled that a police officer violates the Fourth Amendment, and is
denied qualified immunity, if he or she uses gratuitous and excessive force against a
suspect who is under control, not resisting, and obeying commands." (citing *Lee v.
Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002); *Slicker v. Jackson*, 215 F.3d 1225, 1233
(11th Cir. 2000); and *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir.
2000))). Consequently, Defendants are not entitled to qualified immunity at the
summary judgment stage.

## C. Battery

Defendants maintain that they are entitled to statutory immunity on Plaintiff's
state law battery claims. (Dkt. 106 at 25.) Under Florida law, "battery has two
elements: (1) 'inten[t] to cause a harmful or offensive contact,' and (2) a resulting
'offensive contact with the person of the other.'" *Baxter v. Roberts*, 54 F. 4th 1241, 1272
(11th Cir. 2022) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Dist. Ct. App.
1996)). "Traditionally, a presumption of good faith attaches to an officer's use of force
in making a lawful arrest," *Sanders*, 672 So. 2d at 47, but "[i]f excessive force is used
in an arrest, the ordinarily protected use of force by a police officer is transformed into
a battery," *id.* Consequently, "[a] battery claim for excessive force is analyzed by

focusing upon whether the amount of force used was reasonable under the circumstances." *Id.* This analysis is the same as the Fourth Amendment analysis undertaken for an excessive force claim arising under section 1983. *See, e.g.*, *Baxter v. Santiago-Miranda*, 121 F.4th 873, 891–92 (11th Cir. 2024). However, under Florida's sovereign immunity statute, an officer is immune from personal liability "for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function," unless the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

For the reasons discussed above, when the record evidence is viewed in the light most favorable to Plaintiff, a reasonable factfinder could conclude both that Defendants committed battery against her under Florida law by attacking her after she was handcuffed and not resisting and that the use of force was undertaken "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.*; *see Williams v. City of Daytona Beach*, No. 6:04-cv-1879-Orl-19KRS, 2006 WL 354635, at *21, 2006 U.S. Dist. LEXIS 5766, at *66 (M.D. Fla. Feb. 15, 2006) ("[T]here is a genuine issue of material fact as to whether [the d]efendant officers acted in a manner exhibiting a wanton and willful disregard of human rights for their actions after [the p]laintiff had been arrested, handcuffed, and subdued. [The p]laintiff testified that [the] officers dragged him out of the police vehicle after he was already handcuffed and under arrest and that the officers kicked, punched, choked, and beat him. Such level of force applied to [the p]laintiff by the

officers shows a wanton and willful disregard for human rights." (citing *Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. Dist. Ct. App. 2003))).  Therefore, Defendants are not entitled to summary judgment on the basis of statutory immunity.

## CONCLUSION

Accordingly:

1. Defendants' motion for summary judgment (Dkt. 106) is **DENIED**.

2. The court will provide further instructions and deadlines by a separate order.

**ORDERED** in Orlando, Florida, on August 14, 2025.

_____

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Unrepresented Parties
Counsel of Record